UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  Case No: 8:21-cr-0216-KKM-JSS

MICHAEL LUMPKIN
_____

**ORDER**

Defendant Michael Lumpkin moves to suppress incriminating statements he made to federal law enforcement officers during the execution of a search warrant at his residence. (Doc. 20.) On July 24, 2020, the FBI executed a search warrant on Lumpkin's residence and questioned Lumpkin at the residence in connection with a child exploitation investigation. During the questioning, Lumpkin admitted to eliciting sexually explicit photographs from a minor and viewing and trading child pornography over the internet.

Lumpkin argues in his suppression motion and at the hearing that he was in custody when he made the statements but had not been read his *Miranda* warnings in violation of the Fifth Amendment to the United States Constitution. The United States responds that Lumpkin was not in custody when he made the incriminating statements and that he voluntarily agreed to speak with the federal agents. (Doc. 22.)

Despite the length of the interview, the totality of the circumstances here indicates that Lumpkin was not in custody during the interview. Thus, the Court denies Lumpkin's suppression motion.

I. **FINDINGS OF FACT**

On July 24, 2020, at approximately 7:00 a.m., a team of over twenty federal agents and local law enforcement arrived at a residence in Land O'Lakes, Florida, to execute a search warrant for electronic devices that had been used to view child pornography. (Supp. Tr. at 7–9, 16, 30.) Multiple agents—members of the "Entry Team"—approached the door with their guns drawn and knocked and announced their presence several times. (*Id.* at 9–10, 33–34, 54–55.) After a lengthy delay, Defendant Michael Lumpkin and five other occupants came to the door and were ordered to exit the home so that the agents could clear and secure the premises before executing the search warrant. (*Id.* at 10–11, 13–14, 35.) The agents did not have a primary target when they arrived, so they planned to interview the various occupants while executing the warrant to attempt to narrow their suspect list. (*Id.* at 31, 79–80, 109.)

Several other agents—members of the "Hands Team"—remained with the occupants outside the home, while the agents inside performed a protective sweep and began taking pre-search photographs. (*Id.* at 13–14, 90.) Special Agent William Hauser was the search team leader in charge of coordinating the execution of the search warrant.

(*Id.* at 6, 8, 18.) According to his report, members of the Hands Team confirmed the identities of the residents and "advised them that they were free to leave at any time, but if they were to stay their movement throughout the location would be restricted." (Doc. 37-2 at 1.) As a member of the Entry Team, Agent Hauser was inside the residence at the time and did not personally witness members of the Hands Team communicating this information to the occupants. (Supp. Tr. at 14–15, 17–18, 37.) Instead, "it was reported" to him that members of the Hands Team told the occupants "that they would be free to leave" or they could stay but that their "movements would be restricted" if they stayed. (*Id.* at 15, 37.) No member of the Hands Team or any other witness testified as to whether these comments were made, but neither did Lumpkin offer any evidence that he was not informed of his right to leave or forewarned that his movements would be limited while agents completed the search if he chose to remain in the house. None of the residents were handcuffed or physically restrained while waiting outside for the Entry Team to perform the protective sweep. (*Id.* at 79.)

Lumpkin and the other occupants elected to return inside, where they stayed together in the living room of the home while the agents searched. (*Id.* at 59, 81.) Special Agent M.E. Wright, the lead case agent, and Special Agent Deana Jones approached Lumpkin while he was sitting in the living room with the other residents. (*Id.* at 113, 116–

3

117.) The agents asked Lumpkin if he would mind speaking with them. He agreed to do so. (Supp. Tr. at 81–82, 95–96 117–18; Doc. 37-1 at 1.)

The agents then led Lumpkin upstairs to an open living room area that included a couch and two chairs facing the couch. An open archway framed the living room space and led to the upstairs hallway. (Supp. Tr. at 22–23, 40, 58, 83–84; Doc. 36-1 at 7; Doc. 36-2 at 2.) Lumpkin sat on the couch facing the open archway and the agents sat on the chairs opposite him. (Supp. Tr. at 22–23, 41, 84, 132; Doc. 36-1 at 8.)

Special Agent Wright, an agent with twenty years of FBI experience and thirteen years of experience on the Violent Crimes Against Children Task Force, led the interview, while Special Agent Jones took notes. (Supp. Tr. at 84, 107–08, 133.) Special Agent Wright began by asking Lumpkin if he needed any "food, coffee[,] or pills" due to the early hour. (*Id.* at 120.) She inquired as to whether he was comfortable and confirmed with Lumpkin that they were not interfering with his work commitments. (Supp. Tr. at 120–21.) After Lumpkin answered no, the agents began to question him about the investigation. (*Id.* at 121.) The agents started speaking with Lumpkin around 7:30 or 8:00 a.m. and the interview ended with Lumpkin's arrest by the Pasco County Sherriff's office at 1:30 p.m. (*Id.* at 47–48, 90, 125.) Although the agents and Lumpkin were together in the upstairs living area for several hours, the interview portion of their conversation included only "a couple hours" of "[a]ctual talking time" because there were gaps when Special Agent

4

Wright left the living room. (*Id.* at 122–23.) Because protocol required two agents to conduct an interview, Special Agent Jones did not proceed with the interview during Special Agent Wright's absence. (*Id.* at 62–63, 69, 125.)

When Special Agent Wright excused herself to check on the progress of the search and attend to her other duties as the case agent, Special Agent Michael Filippone took her place. (*Id.*) While Special Agent Wright was gone, the "interview" mostly involved small talk about anime cartoons, video games, and other matters to avoid awkward stretches of silence. (*Id.* at 61–63, 69–71, 87–89.) Several times when Special Agent Wright reentered, she asked Lumpkin whether he needed anything and if he was still comfortable. (*Id.* at 123.) Throughout the interview, Lumpkin was calm and cooperative. (*Id.* at 65, 91, 100.) The interviewing agents kept a level, calm tone throughout the conversation. (*Id.* at 86–87, 117.) The agents did not threaten Lumpkin, draw their weapons on him, restrain him, or promise him anything throughout their conversation. (*Id.* at 86–87.) At one point, Lumpkin asked to use the restroom and Special Agent Filippone escorted him there. (*Id.* at 64–65.)

Near the end of the interview, Lumpkin admitted that he had communicated with a fourteen-year-old victim through various phone numbers and coerced her to send sexually explicit photographs and videos of herself and other juveniles. He also admitted to viewing child pornography and trading child pornography images with others via the internet.

5

(Doc. 37-1 at 5–6.) Lumpkin was later indicted for (1) coercing and enticing a minor, *see* 18 U.S.C. § 2422(b); (2) sexually exploiting children, *see* 18 U.S.C. § 2251(a), (e); and (3) possessing child pornography, *see* 18 U.S.C. § 2252(a)(4)(B), (b)(2). (Doc. 1.)

## II.   ANALYSIS

Lumpkin argues that the Court must exclude his incriminating statements made to the FBI agents because the interview was a custodial interrogation and he made the statements before being advised of his *Miranda* rights. (Doc. 20.)

The Fifth Amendment protects the right against self-incrimination. *See* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."). In *Miranda v. Arizona*, 384 U.S. 436, (1966), the Supreme Court extended that right to include "exclu[sion] from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel," *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). A suspect is entitled to the *Miranda* warnings only "when custodial interrogation begins." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). Here, the question is whether Lumpkin was in custody at any point during his interview with FBI agents such that his statements made without first receiving the *Miranda* warnings must be suppressed.

As the party seeking to suppress statements under *Miranda*, Lumpkin bears the burden of establishing that he was in custody. *See United States v. de la Fuente*, 548 F.2d

6

528, 533 (5th Cir. 1977).[1] Custody is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). The Court must conduct a two-step inquiry to determine if Lumpkin was in custody during questioning. *See Luna Encinas*, 603 F.3d at 881.

The first question is whether Lumpkin was seized—or, whether a reasonable person would not feel free to leave or to terminate the police encounter. *Id.*; *accord United States v. Giovanni*, 313 F. Supp. 3d 1278, 1281 (N.D. Fla. 2018) (Hinkle, J.). Everyone agrees that Lumpkin was seized at least for some time during the FBI's execution of the search warrant. (Supp. Tr. at 152–53, 156.) But any initial seizure that occurred when the agents were conducting the protective sweep of the residence likely ceased when Lumpkin was informed that he could leave or, if he returned to the residence, that his movements would be limited. The Court concludes that a reasonable person would feel free to terminate an encounter at that point once so expressly advised.

But regardless of whether or when his seizure terminated, Lumpkin fails to satisfy the second part of the custody inquiry: whether a reasonable person in his position would have understood his freedom of action to have been curtailed to "the degree associated with a formal arrest." *United States v. Deason*, 965 F.3d 1252, 1259 (11th Cir. 2020) (quoting

---

[1] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

7

*United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)); *see Luna-Encinas*, 603 F.3d at 881 ("While 'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest.*'" (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004))); *see also United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006). "This determination depends on the objective circumstances of the interrogation, not the subjective views of either the interrogating officers or the person being questioned." *United States v. Pegg*, 812 F. App'x 851, 856 (11th Cir. 2020) (per curiam) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

The Court must consider the totality of the circumstances to "assess[] whether a reasonable innocent person in [Lumpkin's] position 'would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *Luna-Encinas*, 603 F.3d at 881 (quotation omitted). Those circumstances include (1) the location of the detention; (2) the length of the detention; (3) officer conduct (such as "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled"); (4) whether a defendant was advised that he is free to leave; (5) defendant's freedom of movement; and (6) the defendant's conduct. *See id.* (quotation omitted); *Brown*, 441 F.3d at 1347.

8

The Court concludes that a reasonable person in Lumpkin's position would not have understood his freedom of movement to have been curtailed to a degree associated with formal arrest. Other than the length of the interrogation, every other factor points toward that conclusion. *See United States v. Blackman*, 66 F.3d 1572, 1576–77 & n.4 (11th Cir. 1995) (concluding that even handcuffing and holding a suspect at gunpoint would not necessarily constitute custody where the other factors decisively pointed the other way). And courts have regularly found that even multiple-hour interviews are not custodial where the other factors weigh against a custody conclusion. *See, e.g.*, *Howes*, 565 U.S. at 514–17 (holding defendant was not in custody during a five-to-seven hour interview where he was told he was free to end the questioning and return to his cell even though his freedom of movement was constrained because he was in prison); *Yarborough v. Alvarado*, 541 U.S. 652, 655–58 (2004) (suspect not in custody when his parents brought him to station at detective's request, he was interviewed in small room for two hours by one detective who pressed suspect to reveal details of crime "by appealing to his sense of honesty"); *United States v. McDowell*, 250 F.3d 1354, 1362–63 (11th Cir. 2001) (four-hour interview at port of entry was not custodial simply due to length, particularly since defendant's obfuscation contributed); *United States v. Blocker*, No. 1:14-cr-228, 2016 WL 3281018, at *18 (N.D. Ga. Feb. 29, 2016) (Baverman, Mag. J.), *report and recommendation adopted*, 2016 WL 3259096 (N.D. Ga. June 14, 2016) (Totenberg, J.) (concluding that "even if the

questioning lasted up to four hours, this fact alone would not render the questioning custodial").

Here, Lumpkin was questioned in familiar surroundings at his residence, which makes "courts much less likely to find the circumstances custodial." *United States v. Gomes*, 279 F. App'x 861, 868 (11th Cir. 2008) (per curiam) (emphasis omitted) (quoting *Brown*, 441 F.3d at 1348). And, just like in *Luna-Encinas*, "no one touched [Lumpkin] or intimidated him verbally or physically. 'No handcuffs were employed, and no guns were drawn'" during the questioning. 603 F.3d at 882 (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

The tone of the conversation with Lumpkin was also cordial and calm. The two female agents who primarily interviewed Lumpkin were friendly and accommodating—they asked Lumpkin if he needed anything, if he had work commitments that he needed to attend to, and if he was comfortable on multiple different occasions throughout the interview. At the suppression hearing, the defense repeatedly emphasized that the agents may have been friendly and accommodating to win Lumpkin's trust and get him to confide in them. (Supp. Tr. at 99, 134.) The custody inquiry is an objective one though. *See McDowell*, 250 F.3d at 1362. Even an officer with the most nefarious motives for being outwardly kind, nice, and soft-spoken is still being kind, nice, and soft-spoken. The subjective intent of the individual officers in this case is immaterial. The inquiry is whether

a "reasonable innocent person in [Lumpkin's] position 'would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *Luna-Encinas*, 603 F.3d at 881 (quotation omitted). The agents' accommodating and cordial tone here does not support the conclusion that Lumpkin was in custody.

Further, Lumpkin was allowed to go to the bathroom during questioning, albeit accompanied by an officer. *See Giovanni*, 313 F. Supp. 3d at 1288 ("To prevent the destruction of evidence, and more importantly to promote safety, officers often control the movement of a home's occupants during execution of a search warrant. Indeed, officers ordinarily have authority to detain an occupant—forbidding an occupant to leave—while a search is being conducted." (citing *Michigan v. Summers*, 452 U.S. 692 (1981)). And there is evidence that Lumpkin and the other residents were explicitly told they were free to leave the scene while they were outside. (Doc. 37-2 at 1 ("Agents on the 'hands team' confirmed the identities of the residents and advised them that they were free to leave at any time, but if they were to stay[,] their movement throughout the location would be restricted.").) Lumpkin's counsel argued at the hearing that the government provided no testimonial evidence from the officers who made these statements and that Agent Hauser's report, which constitutes hearsay, is not reliable. (Supp. Tr. at 143–44.) But it is ultimately the defendant's burden to prove custody, *see de la Fuente*, 548 F.2d at 533, and Lumpkin put forth no evidence to contradict or impugn the accuracy of Agent Hauser's report. And

11

since the rules of evidence do not apply to suppression hearings, it is the Court's responsibility to "give [the evidence] such weight as the court's experience and judgment counsel." *See United States v. Dipirro*, 649 F. App'x 930, 933 (11th Cir. 2016) (per curiam) (citing *United States v. Matlock*, 415 U.S. 164, 175 (1974)). Particularly in the absence of contrary evidence, the Court credits Agent Hauser's report, especially given his testimony that these warnings are ordinarily provided as a matter of course when executing a search warrant at a residence. (Supp. Tr. at 15.)

That said, the agents' conversation with Lumpkin was admittedly lengthy. The agents began talking with Lumpkin upstairs in the living area space between 7:30 and 8:00 a.m. and concluded at 1:30 p.m. when the Pasco County Sheriff's deputies arrested him. (*Id.* at 47.) By any measure, this was a long interview—and the longer the interview, the more likely it is to be custodial. *See Luna-Encinas*, 603 F.3d at 881. Nonetheless, the Court is unconvinced that this particular interview was custodial. First, the Supreme Court and the Eleventh Circuit have held that similarly lengthy interviews (lasting multiple hours) were not custodial when other factors weigh against custody. *See, e.g.*, *Howes*, 565 U.S. at 514–17 (five-to-seven hour interview not custodial because the defendant was told he was free to end the questioning); *McDowell*, 250 F.3d at 1362–63 (four-hour interview not custodial because there were delays that prolonged the interview and the defendant was not physically restrained). Second, the interview of Lumpkin was effectively paused

12

multiple times when Special Agent Wright, the lead interviewer, stepped out for extended periods to perform supervisory duties and check on the progress of the search. As Special Agent Wright testified, this meant the agents had only "a couple hours" of "[a]ctual talking time" with Lumpkin. (Supp. Tr. at 123.) These lengthy pauses in the interview help to explain the total interview time. And finally, Lumpkin had the freedom to use the restroom during the interview and was asked if he needed anything, such as "food, coffee[,] or pills," and if he was "comfortable" at different points during the interview—all while calmly talking to him in his home. Unlike other cases where custody has been found, Lumpkin was not taken to a small, enclosed location and prevented from leaving that location until he confessed. *Cf. United States v. Hashime*, 734 F.3d 278, 281–85 (4th Cir. 2013) (concluding the defendant was in custody when he was taken to a storage room in a basement and questioned for three hours without being allowed to leave).

      The facts in two similar cases are instructive here. In *United States v. Giovanni*, roughly twenty officers arrived at the defendant's residence at 7:00 a.m. to execute a valid search warrant. 313 F. Supp. 3d at 1279. Several officers approached the door, knocked and waited around thirty seconds, then breached the door with a battering ram and entered—guns drawn—loudly instructing anyone in the home to show themselves. *Id.* at 1279–80. The defendant, along with the two other occupants, came downstairs. Each person was handcuffed and taken outside in their sleeping attire where it was quite cold

13

(no more than forty degrees). *Id.* The officers eventually escorted the defendant back inside and advised her that she was free to leave. The tone of the interview was conversational with occasional raised voices. *Id.* at 1280. The defendant was allowed to use the restroom once, accompanied by another officer, but was not allowed to brush her teeth, change clothes, or shower. After around two hours the defendant asked to call her lawyer and the interviewing officers immediately acquiesced and did not interview her further. *Id.* The district court concluded that the defendant "had been seized but was not in custody" because "her freedom of movement had not been restricted *to the degree associated with a formal arrest.*" *Id.* at 1289.

And in *United States v. Peck*, the district court adopted the report and recommendation of the magistrate judge and concluded that the defendant was not in custody. 17 F. Supp. 3d 1345, 1348 (N.D. Ga. 2014). There, nine federal agents and additional officers executed a search warrant at defendant's home at 6:15 a.m. *Id.* They approached the door with their guns drawn and banged on the door, announcing their presence. The defendant came to the door in a bathrobe and the agents grabbed him by the hands and pulled him outside. *Id.* at 1348–49. While the officers did a protective sweep of the home, one officer held the defendant's hands behind his back for four to five minutes but did not handcuff him. *Id.* at 1349. The agents told the defendant he was not required to stay if he did not want to stay. Agents asked the defendant if he would like to speak with

14

them in a private part of the house and the defendant agreed. *Id.* at 1349–50. The interview lasted around forty-three minutes and, in the end, the defendant admitted to searching for child pornography and sharing it. *Id.* at 1352–54. The Court concluded that the defendant was not in custody because he was questioned in his home, was advised he was free to leave, and was not handcuffed, searched, or patted down. *Id.* at 1348.

This case is similar to *Giovanni* and *Peck*, where the courts concluded that the defendants were not in custody. Like in those cases, a large team of federal agents arrived at Lumpkin's residence early in the morning to execute a search warrant. The agents conducted a lengthy interview of Lumpkin but, unlike in *Giovanni* and *Peck*, they never physically restrained Lumpkin prior to or during the interview, shouted at him, or actively prevented him from going about his morning routine. Instead, the agents cordially conversed with him without raising their voices, allowed him to freely use the restroom, and asked him if he needed any "food, coffee[,] or pills" due to the early hour. (Supp. Tr. at 120.) Just like in those cases, therefore, the Court concludes that Lumpkin was not in custody during his conversation with the agents because his freedom of movement was not restricted to the degree associated with a formal arrest.

The out-of-circuit cases Lumpkin cites to support his argument are easily distinguishable. In *United States v. Cavazos*, the Fifth Circuit concluded that the defendant was in custody where the defendant was handcuffed and law enforcement forced

15

the defendant to allow them to listen to his private call. 668 F.3d 190, 194–95 (5th Cir. 2012). And in *Sprosty v. Buchler*, the Seventh Circuit held the defendant was in custody where a specific officer was assigned to guard the defendant throughout the encounter and the officers repeatedly asked direct questions about the incriminating evidence and indicated that the defendant was the exclusive target of their investigation. 79 F.3d 635, 642–43 (7th Cir. 1996). Unlike in *Cavazos* and *Sprosty*, Lumpkin was never physically restrained before he was formally arrested and was not assigned a specific officer to "guard" him during the execution of the search warrant. Further, Lumpkin was not the "exclusive target" of the investigation. In fact, Special Agent Wright testified that her primary suspect was a different resident who lived at the house. (Supp. Tr. at 113–14.)

At bottom, despite the length of time, there are no other reasons to conclude that the officers coerced Lumpkin into answering their questions in violation of the Fifth Amendment. When all the circumstances are considered, the scale tips decisively toward the conclusion that Lumpkin was not in custody during the interrogation.

Accordingly, Lumpkin's Motion to Suppress (Doc. 20) is **DENIED**.

**ORDERED** in Tampa, Florida, on April 20, 2022.

Kathryn Kimball Mizelle
United States District Judge